Case number 15-1018, United States Postal Service Petitioner v. Postal Regulatory Commission. Mr. Belz for the petitioner, Mr. Whitaker for the respondent. Good morning, Mr. Belz. Good morning. Good morning, Your Honors. You may please the court. The issue before the court largely boils down to whether the commission arbitrarily defined the market in which the mail delivery of DVDs operates. Specifically, is DVD by mail service a market unto itself, or is it part of a broader market that includes other delivery networks over which movies and other related content are distributed? And what's our standard of review? The standard for that is arbitrary and capricious. So if there is evidence on either side, it's pretty hard to find a ground to reverse that, is it? Well, there's no, if I may, Your Honor, I don't think there is any evidence to support the proposition that DVD by mail service is a market unto itself. Counsel, I have a little problem with your position in light of the statute. The statute looks to me to be narrower than any trust law. As I read it, each product and the sales, I won't read the whole thing, but the key language that I read, without risk of losing a significant level of business to other firms offering similar products. And at page 18 and 19 of the commission's brief, the Postal Service would likely be able to increase the price of the round-trip mailer considerably without any significant risk of losing business to other firms because no other firms supply a round-trip mailer or any closed substitute. Why doesn't that resolve the case against you? For two reasons. Without even getting into the more difficult question of whether or not we should define the relevant market as limited to the first step or go down to the second step. Your Honor, I have really two points, but the central point to that is that all then, as to what a similar service is, you have to ask what the product is. This isn't like most of our competitive products, which involve shipping a box. You ship a box, and the question is how do you get the box from point A to point B? And there it seems pretty clear that the competitive alternatives would be UPS, FedEx. Here the issue isn't a box. The product isn't a box. The product is a movie. The product is digital in nature. And therefore, digital— Your client is not offering movies. Pardon, Your Honor? The Postal Service is not offering movies. That is correct. We are a distribution network. We are a delivery network, and because the product is digital— Counselor, it says without risk of losing significant level of business to other firms offering similar products. Which are the other firms? The other firms are other distribution networks. This is, again, because of the product. The product is a movie, and the question is are there similar services that can transmit that movie to the customers? You can't say the product is a movie because you're not offering movies. I mean, just to help you out, at least you should say your product is a distribution network. That is correct. It's not a movie. No, that's correct, but the question is as to whether there are similar— the similar products, I think, refers to similar delivery services, as it were. I think that's what the statute says. You're saying that the streaming services are sufficiently similar to fill that niche in the statute. The commission is saying, no, they're not, and this is a matter of statutory interpretation. So why isn't Chevron the— And that was going to my second point, Your Honor, if I may address it. What the commission did is really viewed this statute through the prism of antitrust law. It was really asking as to whether there should be competitive— They make both points. They make a statutory point, as I've just read. And they also make an antitrust analysis. The commission's brief makes a statutory point. The commission, which is the only thing that's on review now, the commission's order doesn't make that statutory point. The commission's order asks— You didn't say that in your brief. I think we did, Your Honor. Where? I think in both the standard of review in terms of talking about this type of antitrust law— I don't recall you making a point that the brief is different than the order. I thought that was the first argument we made in our reply brief, that the commission was making a different argument than was made— It would have to be in your reply brief, in any event. Correct. I thought the first argument we made— You couldn't make an argument until they made their argument. I think in our first substantive argument in our reply brief was that the commission was advancing a different argument than the argument addressed below. The argument addressed below—I mean, essentially the ultimate question here is whether the Postal Service has market power within the meaning of the statute. In a way, our opponents broke that down into two subsidiary questions. The first one was, does DVD buy mail service? Is that a market unto itself, or does it compete with other services that use other delivery channels? And then the second question was, even if it does, even if the market is competitive in that sense, that may put competitive pressure on Netflix and Gamefly, but it doesn't necessarily, in turn, constrain the prices the Postal Service can charge the direct customers. What the commission did was address the first question, whether DVD buy mail is part of a broader market, and came to the answer no. And that didn't really reach the second question. But isn't that really—I mean, this is different. The standard is the same as under antitrust law, but very fundamentally different is that the burden is different. It's your client who has to bear the burden to show that the market that you believe is the relevant market is, in fact, and there's no price elasticity data. And isn't that your fault or your client's fault? Why is there no price elasticity data showing the effect? Because the price elasticity data would be relevant—well, first of all, the commission has never required that before in any competitive product filing in the past. And the reason for that is because to get for price elasticity data to be meaningful to the ultimate question about the effect of our prices on demand, you first have to establish what is the market price. And here we don't have a market price. We have our existing price, which is subject to a price cap. Our point is— Why isn't that at least a reasonable surrogate for a market price, what's being charged now? The commission has never—Congress, when it established the price cap, was not using it as a proxy for what would be the market price. It was just establishing a competitive price. I'll give you—I mean, sorry. It was establishing a price over which we cannot charge. To give you an example of how this works or how this has worked in other product transfer cases, that's to the question about the impact of our pricing. The commission at several points has required us to raise our prices as a condition of becoming a competitive product. What is it in this case that they were supposed to use for guidance rather than the price that exists? That's a question that has to be resolved. It's evident on the record that the service can be sold at that price. That's at least some evidence, isn't it? The price is being sold and that's the price. There is a price that we charge, yes, and the question is— And it's worth being sold at that price. Yes, and then the question is, is that the market price? The question is, what's the market? And that's where we're back to—that's the question the commission didn't—I mean, that's the question they got wrong, is what's the market. The question of what's the market price and what impact are—what we can do with the question they didn't reach. Well, hold on a minute. I would take you back to my original question on that. Wasn't there evidence before the commission on both sides of the question of what's the market? There was no evidence to support the commission's determination. There was no evidence to support the commission's determination? None. The commission's determination was essentially a hypothesis. The hypothesis was, although maybe DVD-by-mail companies compete with other services, streaming services, kiosks, retail locations, as a broad proposition, that may be true, but the remaining DVD-by-mail customers, the ones who haven't left yet, will not leave. That they are essentially captive to DVD-by-mail services because of the content. How many are there? That was my hypothesis, but there is no evidence— Counsel, I ask you a question. I'm sorry. How many are there? How many— I wasn't clear from your brief. How many of the customers who watch movies, just look at Netflix, what percentage of them are still using by mail? I believe that— It's rapidly diminishing. I know that. It's rapidly diminishing. I know this, that the number at the time, as of 2011, Netflix had about 11 million DVD-by-mail customers. At the time this case was filed, they had about 7 million. Now it's closer to 5 million, according to their most recent SEC filing. 5 million out of a total of what? I don't know the exact number, but I think it's probably—and this is in their SEC files, but I think they have about 43 million streaming customers. So it's about one-tenth of their customer base. And there's only 5 million left. Correct. And they're particularly profitable, as I read the briefs. They being the customers who get the movies by mail. It appears that their unit profit is high, according to the brief, the commission's brief. Relatively high compared to the streaming. But the overall amount of profit is much lower, of course. Yes, because— It does appear that way. Now, what that means, I don't know. What it could mean, though, is that the price we charge for mail delivery is a far below market price. I mean, I don't know that. The commission would have to resolve that on remand. But, you know, part of the argument that both Gamefly and Netflix made was, well, look, we're not going to switch because other distribution channels are far more expensive. But I don't understand how that argument helps. Again, that's the question—again, the commission needs to address that question. But that then raises the question, well, then what is our—are the prices we charge for our distribution network a market price? Are they a below market price? Because ultimately the question isn't can we raise prices. The question is can we raise prices to—can we charge super competitive prices? Exactly. And it would seem that you haven't shown that you cannot and that the burden is on you. Because, yes, you've shown that there's an enormous hemorrhaging of market to streaming. Everybody knows that. And to some extent—I mean, is that dependent or independent on prices? Is it going to—are more people more quickly going to go streaming and therefore discipline the price that the Postal Service pays if you're allowed to offer it as a competitive—the mailer as a competitive product? And I don't see where you've shown that in the record. It seems to me just as likely, if not more so, that this is a battle over those rents and that you see that, you know, Netflix has—is getting some profit from its relatively uncompetitive position. And, of course, the Postal Service would want a bigger piece of that. But the notion that there's actually evidence showing that the streaming markets are substitutes for the mailer market in a way that would discipline the price you're charging for the mailer, I don't see that you've, you know, kicked out the evidence that they have that it's—that the relevant market is the mailers. Well, frankly, again, we would love to be able to make that showing about the discipline, but the commission didn't reach the question. And so that—for us to make that show, that has to go back to the commission. Because the commission—the commission comes off as a threshold matter. Counsel, will you quit interrupting the court? I'm sorry, Your Honor. You're absolutely right. I apologize. The next priority is to hear each other, nothing else. I'm sorry, because I interrupted you. But they did do a market analysis. And, you know, in considering sort of hypothetical monopolies in this situation, they did do that analysis with the data that they had. The commission's analysis, once again, was entirely—boiled down to a hypothesis that the consumers who haven't left won't leave DVD by mail. And the problem with that is there is literally no evidence to support that proposition. This is about the core customers, all right? This is about the idea that, yes, maybe customers in general will leave DVD by mail for alternatives we know they have. But the ones who haven't left won't leave. And the problem is there is no evidence to support that proposition. Because it's premised on the idea that they—the reason they stay is because of the specific kind of—the specific inventory that DVD—that Netflix offers. Well, and technical problems and windowing. I mean, you know, if you've been anywhere outside of urban America, you know, the technical problems are very substantial for people that don't have fiber optics and broadband. So, I mean, there are a lot of different reasons why, you know—and you say, well, it's just this core group. It's not a sentimental idea about, you know, film aficionados. There's a lot of determinants of the stability of the mailer user's market. Most people don't have children at home to show them how to do these things. You're right, Your Honor. But we also don't know what percentage of those people are using DVD by mail service. And that's the problem. There is a complete lack of evidence supporting the idea that the people who are still— Well, who's got the burden? Why did I stop? Who's got the burden? We don't—quite frankly, we have the burden overall, but there's no way for us to prove, for example, what movies, Netflix, DVD by mail customers are still renting. Because, again, the premise is that most—I mean, that is the fundamental premise of the commission's order, is that the differences in content are keeping most of these customers— You say that can't be proven one way or the other. I don't understand that. Oh, I'm not saying that. You say there's no way for us to prove it. Is there any other way for them to prove the opposite? There sure could have been. The commission, if it— Well, why would they have greater access to the evidence of your market than you would? Because the question is, what titles are Netflix's customers renting? We have no way to know that information. What was that again? Counsel, I didn't hear you. I'm sorry, Your Honor. We—that question is, which titles are Netflix's DVD by mail customers renting? We have no way to know that information. If that were important to the commission, Netflix was a participant in these proceedings. The commission could have asked Netflix. Why can't you? Why couldn't have you? That's not part of the procedure under the—that's not part of the commission's procedure. We can't ask questions. We can't conduct discovery. This is something—if the commission thought that was important, that's a question the commission could have found out from Netflix. We don't know what titles we're shipping. We just know we're shipping them. But another point— You are not allowed to question Netflix in the procedures and proceedings before the commission? We are not allowed to question Netflix. That's right. The—but I do have two further points. And if that were true—and I'm sorry, Your Honor, I see my time's up. If I can make them very, very quickly. If it were true that the consumers who are left won't leave either because of digital technical problems, they wouldn't still be leaving. They're still leaving. I mean, Netflix showed that they had a 20 percent decline in their DVD-by-mail volume last year. So they're still going. So there's an idea that they're still captive. So why do you care? This is a product that's disappearing. Why do you—why are you anxious to raise the price on a product that's disappearing? We're not anxious to raise the price, Your Honor. We are—I mean, look, that is the question that keeps us up at night. How can we keep this a viable thing? And our point is the market will take care of that. We're not— The market will take care of what? That if we try to raise prices to a super competitive level— No, it's not a question of raising prices to a super—this product is disappearing, but streaming is more—is much more desirable. And we have every incentive to make our delivery channel as desirable as possible. We do not need the constraints of a price gap. We're here seeking less regulation to recognize that this is a very competitive market. Incidentally, counsel, I went back and looked at your reply brief, and you do not specifically raise the point that I raised, that the government—that the commission did not rely in any way on the statutory language. You do make an argument that the relevant market is phrased somewhat differently in the briefs than it was in the commission order, but you don't contest that the plain reading of the statute refers to other—what is the word? Other firms that are supplying similar products. I mean, that is in the commission's decision, as I recall. Because that question—Your Honor, if I may, that question, the question you're asking, that part of the statute, goes to the market power question, which is the question the commission didn't answer. You don't even have to decide the market power question. All you have to say is, hey, there are no other firms, therefore, the statute does not permit. Because the commission said there are no—the basis for saying there are no other firms is because it defined the market as exclusively DVD-by-mail service, for which we are the exclusive provider. Our point was that the market is much broader than that. I think that's a narrower concept than the relevant market. The statute is narrower than any trust law. The commission applied this entire thing through the prison— In your brief, you're sort of cute about this. As you say, that framework has not been unambiguously foreclosed by the text of Section 343642B1. As if you have—of course, when you cite a case, it has nothing to do with the price of tea. Cut to Bluff City. But in any event, your point is there's ambiguity, and you're entitled to the interpretation of the ambiguity. Frankly, what I'm saying is there's ambiguity in there. Therefore, the commission was entitled to interpret this entire inquiry through the lens of antitrust law. If that turns out to be wrong, then the case should be reversed for that reason. I see your point, but I thought they straddled two horses. The commission did? Yeah. I don't think the commission's order did, frankly, Your Honor. I think maybe the commission's brief did, but the commission's order didn't. The commission's order was analyzing this as an antitrust question. Didn't it even refer to the statute at all? Not in terms of the question you're asking about similar services. When you wrote your brief, you saw that this was a point that certainly could have been made because you tried to dance around it. Well, I didn't intend to. I mean, what I saw that question is going to is the question of the Postal Service's power. And because the commission said, and they said very clearly, by the way, that it wasn't reaching the question of what our power is if the market is defined narrowly, or defined broadly to include other delivery services, then I didn't see any need to specifically rebut every single one of their points because I think they're asking a different question on appeal than the one they answered below, which is, is DVD by mail service a market or part of another market? That doesn't end the case if we're right about that. But that's the question. It does if they are. Pardon? Doesn't it if they are? It is if they are. Not quite, but it's a harder case for me. Fair enough. That's where they are. Why don't we hear from the commission, and we'll give you a couple of minutes. I appreciate that. Thank you. Mr. Whitaker. May it please the Court. The commission absolutely relied not only on the point about competition in the market for consuming DVDs by mail, but also and most centrally on the proposition that there are no reasonable substitutes for the round-trip DVD mailer, which is the product at issue in this case. And I would point, Your Honors, to JA 595. As noted above, quote, As noted above, however, one must distinguish between direct consumers of round-trip DVD mailers, such as Gamefly and Netflix, and indirect consumers who consume the digital entertainment. So we are drawing an explicit distinction between those two things, and that discussion in turn refers to 12 pages of commission analysis in which the commission, which was focused on supposed alternatives to the round-trip DVD mailer. So I think it's absolutely clear. But counsel says that on page 18 of your brief, quoting the statute, 18 and 19, and what you nicely say, the evidence showed that on the contrary, the Postal Service would likely be able to increase the price of round-trip DVD marker considerably without any significant risk of losing business to other firms because no other firms supply a round-trip mailer or any closed substitute for that method. Counsel says the commission never said that. The brief says it, but the commission never said it. Is that right? No, that's not at all. That's a statutory interpretation question, which arguably is more narrow than general antitrust law. Well, let me answer that question in two ways. You understand what I'm saying? I do, I think. Point one. Did you write the brief? I certainly did. So are you making an argument the commission did not make? No, I'm not making an argument the commission did not make, Your Honor. The commission certainly relied centrally on the proposition that, which is undisputed here, Postal Service is the only firm in the country that supplies a round-trip DVD mailer, and that is quite central. Now, Your Honor makes the further argument about whether the statute is narrower than antitrust law. I did not understand the commission to hold that, and that was not the case. Well, your brief certainly suggests that. Well, I didn't intend that sentence to mean that, Your Honor. I think what I was trying to say is that that goes to the question the commission answered, which is whether there are reasonably available and interchangeable substitutes for the round-trip DVD mailer. In this proceeding, it was not necessary for the commission to answer the broader statutory question that Your Honor points to, namely whether the statutory language is narrower and therefore less friendly to the Postal Service in this proceeding than antitrust law. So you disavow the argument you make on page 18 and 19? Well, I hate to disavow arguments that are in my favor, but I think that I cannot, in good faith, make that argument on appeal because I do not understand the commission's decision to have reached that question, and I did not intend that sentence to mean that. Now, it may be outcome determinative in some future proceeding if the Postal Service were able to show that there were sufficient competitive constraints on a certain market. So then we are obliged to deal with a much more difficult question, which is, is the relevant market limited to the mailing or immediate distribution in that manner, or do we look to the ultimate consumer? I regret to say you are obliged to answer that question, I believe, Your Honor, yes. And Mr. Witter, what's your response to Mr. Belt on his assertion that the only evidence before the commission is that there is a core group of customers of DVD by mail, and that other than that there's nothing showing price elasticity or lack thereof? Well, there is evidence, but there doesn't need to be, since the Postal Service has the burden of proof in this case, but there is plenty of... That's a little challenging, since if he's right that they aren't allowed to get information and put it before the commission, how are they supposed to meet that burden? Well, first of all, two points on that, Your Honor. First of all, certainly there are a variety of cases in which the Postal Service presents very sophisticated evidence about elasticities and provides estimates of what will happen to its profits in the event of price changes. So certainly that is, and the Postal Service is certainly in the best position to provide that evidence. And also, I mean, just more broadly, this Court here sees antitrust cases all the time, and in those cases there's all kinds of sophisticated evidence presented by economists and so forth about market definition. We don't have anything approaching that in this case. What we do have, I think, it's fair to say, suggests, though, that the commission's decision to hold the Postal Service to its burden of proof was reasonable. I point to a couple things. First of all, there's no question that DVD by mail service remains a highly profitable business that Netflix and Gamefly provide to millions and millions of DVD by mail customers. What do you mean millions and millions and millions and millions? Well, I just heard that it's only, what was it, it's down to 5 million? That's 2 million. What's that? I said that's 2 million. Well, I hadn't heard the 5 million figure. I thought the record, I mean, the 2014 Netflix 10K said 6 million DVD by mail customers. That's rapidly diminishing. You agree? Well, rapidly diminishing, but perhaps at a diminishing rate. I mean, what the record shows is that. You're going to have some kind of hardcore that's going to stick forever. Well, I mean, the record in this case shows that. If we look at antitrust principles, our concern is the consumer welfare, right? Certainly, Your Honor. So the ultimate consumer wants streaming, obviously. So why isn't it a good thing to push Netflix into further and further streaming? The inhibition for Netflix is it costs them more to buy some of the rights to stream than it does to send the disc, right? That's what I gathered from the briefs. Well, as an initial matter, the consumers, the relevant consumers, principally relevant consumers in this case, are the consumers of the DVD record. You mean you're talking about the relevant consumers are Netflix and Gamefly rather than the ultimate consumer? Well, they are, although. Well, no, what's your answer? We should not be concerned about the ultimate consumer? Well, no, you should be concerned about the ultimate consumer. Don't we want to do everything we do to hasten the movement towards streaming? That's what customers want. Well, first of all, the question here is whether the Postal Service would be able to raise the price of the round-trip mailer significantly without a significant risk of losing business to other firms offering competing products. Now you're back to the statutory argument. Are you conceding Judge Subramanian's apparent belief that the role of the court should be to push the customer toward what the customer should want rather than allowing the customer to spend the money for what they want? Yes, because I want more streaming. No, I'm teasing, of course. I doubt if you know what else, Chris. I do stream. I do stream. I'm the archetype individual who dropped the mailing because I do the streaming. I want more titles on streaming. Well, but actually, one of the things the record shows in this case is that actually two-thirds of the DVD-by-mail customers also subscribe to the streaming service, even though they have to pay at least double the cost and sometimes much more for both services. I mean, that's because Netflix hasn't been pushed into buying or paying more for the titles that they can use streaming. So if you were to raise the price, that would be a good idea, then. We would push Netflix into more streaming. Well, I think, first of all, that's not really what the question is before the court. Oh, I'm teasing. I'm teasing entirely.  The point is that it's not clear that raising the price on the DVD mailer, let alone the round-trip mailer, which is really the question here, is going to push at least enough customers to the other delivery networks. Why should we care? Here's a more direct question. As a matter of antitrust principle, why should we care about the post office gaining more of the profit from Netflix? Because that would mean that they might well have market power within the meaning of the statute. Because what they would be able to do, potentially, and certainly the Postal Service presented no evidence rebutting this fact, is they would be able to raise the price on Netflix significantly. And this court considered a similar kind of situation in the coal exporters case, where there was a similar argument made by the Interstate Commerce Commission, that there was an all-encompassing competitive market in the coal export market, and that would somehow indirectly constrain the market power of shippers. Isn't the short answer to why we should care, because Congress told us we should care about this? Absolutely, Your Honor. I mean, I think that if the Postal Service can jack up the price of the mailer on Netflix, and, by the way, Gamefly, that is certainly a matter of concern under the statute. And, again, the only direct evidence we have of the behavior of these— No, no, wait a minute. Stop for a second. If you were to extract greater profit from Netflix, but the ultimate price didn't change, is that an antitrust concern? Well, I mean, the statute does talk in terms of price increases, but I mean, I think that they would likely have to increase the price in order to do that. No, not necessarily at all. In fact, it might not. In fact, from the record, it's not clear at all. But let's assume hypothetically. Let's assume—this is an interesting antitrust question. If you had the capacity to extract greater amounts from Netflix profit on mailing, but it did not affect the ultimate price, would that be an antitrust concern? It potentially would be, because, I mean, there presumably would be some comparison of what relationship that price bore to the Postal Service's cost, because it also talks about increasing price above cost. So if there were—and that's a very difficult empirical question to figure out. So, yes, as a theoretical matter, that still might be a concern. You'd also have to look at whether there's any quality decrease in the product, too. So those are all matters of theoretical antitrust concern, of which there is absolutely no competent evidence in this proceeding of that very complex question. It is very complex. And so I think that on this record, certainly the commission was reasonable in saying that the Postal Service had not met its burden. And I wanted to go—I'm sorry, Your Honor. Go ahead. Finish your thought. I just wanted to talk a little bit more about some of the other evidence. We don't have much in this case, admittedly. But one data point we do have is what happened is the experience of Gamefly. And so Gamefly used to have to pay double the cost for this very same service. And there's no indication that there was some dramatic shift in Gamefly's volumes once that happened. And, indeed, the beginning of FY 2014, as a result of the discrimination complaint, Netflix got a 50 percent price decrease. And the volume didn't suddenly, like, jump up real high. Gamefly got a decrease. I'm sorry. Gamefly—I'm sorry. Gamefly got a decrease. And the volume didn't just massively jump up. It actually kept going down a little bit. And I think what that highlights is that those massive volume changes that Postal Service points to, that doesn't have anything to do with price—anything necessarily to do— or at least some indication that that doesn't necessarily have anything to do with price sensitivity. The price sensitivity we really need to look at, if any, is at the original consumer level, that is to say Netflix and Gamefly, rather than at the ultimate consumer. Would that be correct? Yes. Yes, although I do think that it's true that the Commission did take seriously the Postal Service's argument about competition in the content market and reasonably concluded that, look, there are substantial differences between the DVD-by-mail product and other kinds of digitized entertainment, many of which are available or free on the Internet. And if they were to come up with better evidence, they could come to the Commission with it. Certainly, Your Honor. And they could file a new request tomorrow with better information. Is it true that they're not able to question Netflix in your procedure? Yes, Your Honor. In this kind of proceeding, they would not. There are certain kinds of Commission proceedings where you do have discovery. This is not one of them. However, they certainly could ask the Commission to do an information request of Netflix. And they never did. And Gamefly—well, I'm not aware if the Postal Service requested that. We did actually ask, in this case, ask for various information from Netflix and Gamefly. And we did get some. We also—I mean, even more notably, we asked the Postal Service. And what we asked them was, look, all right, you want to treat this as a competitive market. Have you done any studies about, like, what's going to happen with your volumes, like whether your volumes are going to be cannibalized by alternatives? And they came up with nothing. They had no examples of that. And one might have expected that— What do you mean cannibalized? I'm a little confused. Well, I mean, whether they might—the extent to which, if any, they might lose sales in the DVD mailer to competitors. I mean, one might think that an entity that wanted to go into a competitive market would have done some kind of study about that, but apparently they hadn't. In other words, to establish that it was a competitive market, they would have shown how potentially they would lose sales if they raised their price. Right. That's what you're saying. Yeah, yeah. And that would be relevant. And they didn't really provide us with anything. Is your basic case here, is the Commission's basic case, a burden of proof problem, that the Postal Service did not meet its burden of proof? Is that true? Absolutely, Your Honor. And again, I think this is a complicated economic question. It certainly is. And I certainly wouldn't deign to say that we have conclusively resolved that, but I think that it was reasonable for the Commission to say at a bare minimum that, look, this is complicated. We don't have enough evidence to conclude that the Postal Service wouldn't be able to potentially, for example, exploit Netflix and Gamefly by capturing from their profit margins, or that there is somehow an all-encompassing competitive market for digitized entertainment. And can you just address very briefly the industry perceptions aspect? I mean, the Commission says it relies on four factors, and I'm not sure if one of those factors is not really supported by substantial evidence, three enough, two enough. If you could talk a little bit about sort of particularly that factor, which I think was attacked by your opponents as very weak or misapprehended. Oh, I think that's actually a very strong aspect of the decision. This is a JA 600 and 601 where we discussed the fact that Netflix and Gamefly view, or at least Netflix, Gamefly at the time didn't even have a streaming business, which is an interesting fact, because you couldn't at that time stream console games. But Netflix certainly did, and it treated DVDs by mail and streaming as two separate businesses operated differently with different characteristics. On their 10Ks, there's like different profit statements for each line of business. And yes, we relied on the fact that that business continues to be highly profitable, and that Netflix anticipates that it will continue to supply a substantial source of profit for its business for the foreseeable future. That's really what we want to worry about, whether Netflix is profitable or not. That's really our major concern. Well, I think the major concern is as a runner. No, I'm choosing again on that one. I think it's certainly relevant under the statutory standard, and just as in coal exporters, certainly the division of rents between the postal service and Netflix is not one of regulatory indifference. In another context, in another case, I described Netflix's position in the Internet as looking for rents, but here it's just their dominant market position, right? I think there's certainly some evidence suggesting that, Your Honor. Yes. I'm happy to answer any further questions the Court might have. We would ask that the decision of the review be denied. Thank you, Mr. Whittaker. Mr. Bell, we'll give you two more minutes. I just wanted to quickly point out the question of whether we're looking at the ultimate consumer or Netflix and Gamefly as consumers. The Commission's entire analysis is about the ultimate consumer, even in the point that my opponent mentioned on page JA595. It said that we must distinguish between direct consumers, meaning Gamefly and Netflix, and the ultimate consumers of the product. And then the Commission said the two are related. The demand of the direct buyers will be derived from the demand of the indirect buyers. And we are going to focus on the indirect buyers, the end consumer, but only those consumers now indirectly consuming Raptrip DVD now. So, in other words, the Commission's analysis was based on the end user, but only the end user currently using DVD by mail. And so the reason that's significant is that's the issue the Commission decided. The Commission decided is DVD by mail service in the same market as other services using other distribution channels. The other questions Your Honor answered are good questions, and they are questions that we ultimately need to prevail on to win the case. But right now the Court's job is to review the decision the Commission made and not to affirm on a different ground. Well, wait a minute. That's a fair point. But the Commission did emphasize you didn't meet your burden of proof on this case. The burden as to the question that they asked, the question is whether DVD by mail service is in a different market. I think we clearly proved everything we could possibly prove on that. There wasn't much dispute. The question is do consumers view these other distribution channels as reasonably interchangeable with movies rented through DVD by mail service? Frankly, the consumers have spoken on that question. They've been substituting for years. Again, Netflix's DVD by mail customer base has gone from 11 million to 5 million just in the last four years, and it's not that they've stopped watching movies. But if the relevant market is limited to the direct, to the primary level rather than the secondary level, then you lose. If the relevant market is limited to just DVD by mail service? Right. I don't think we lose, Your Honor. I think the remaining argument is who has the relative power between us as monopolists over the distribution channel and Netflix over monopsonists over being the all-sold purchaser of delivery services. The Commission never grappled with that question. Did you? Yeah, we did. That was in both our opening brief and our – I'm sorry, did we grapple with it below? What evidence did you present? The only evidence we pointed out is that Netflix has emphasized that it will leave, or that there's always a risk that it will leave if we raise our prices on them. And, in fact, the entire premise of the underlying litigation was Netflix's statement that if we raise prices on them, that that will accelerate the demise of DVD by mail service as they will migrate their customers. If that's the only evidence, do you lose then? Yeah. Well, that – Isn't that what – Be that as it may, Your Honor, but I think – Well, stop, stop. If that's the only evidence, you lose, right? I don't see why it is because I think the Commission still needs to analyze the issue. That statement certainly was some evidence, wasn't it? That was evidence in our favor. And Netflix has filed a statement before the Commission. Isn't that some evidence on the part? But that would be evidence in our favor. I don't think there's any evidence that – there's no evidence, for example, that we're a bottleneck, or that Netflix has no options. No, no. If you raise your prices, Netflix reduces its business with you. Is that – is that – that is evidence on your side? It would be evidence that would limit our ability to raise prices. Sure. If that's the question. But I think, again, the question that this – that the Commission decided was defining the market. I must be missing – I'm not sure I understand either. What evidence was presented concerning the impact of your raising prices? The only evidence that we're pointing to is Netflix's statement that if we raise prices on Netflix, that Netflix would migrate away or accelerate their migration away from DVD-by-mail service toward other distribution channels. If that happens, we don't make money, right? So that means that would be a limit on our ability to raise prices, that our direct customer would accelerate their departure from the thing that they're buying from us. Yes, but how do we calculate – that's not a question of an alternative – of moving – somebody moving to an alternative method of delivery. That's the ultimate – that's – your notion is Netflix is the ultimate customer. How do we analyze that under any trust laws? Again, Your Honor, this – these are questions that need to be addressed on remand because they weren't addressed in the first instance. Excuse me. Excuse me. Sorry, Your Honor. It goes back to the same question of whether the definition of market is the end of the case. If the effect of the rise would be to drive you from the market as opposed to choosing alternatives, then that would be evidence in favor of the Commission, would it not? If the – Or is it evidence in favor of the service? If the – could you – I'm sorry, Your Honor, could you repeat the question? If it is correct that the only evidence was that a price increase could drive you from the market, if the market is defined as the narrow way in which the Commission defines it, would that not be evidence in favor of their finding that you have market power? I must confess that I think I must be misunderstanding the question because it seems to me that if we raise the prices of delivering DVDs – Forget about your prices. And if doing that – Forget about your prices, Your Honor. Okay. Oh, if they raise their prices. We're talking about their – I'm sorry. I'm sorry. You're right. You're right. You raised the price. Yeah. And you could drive customers from the market. Any time that there's market power, that is an element of it, isn't it? I think that's an element of it. As opposed to driving them to an alternative. I think it's the contrary, actually. Yeah. Drive them from the market altogether. Any time you have market power, unless you have totally capital customers, that is necessity, then you're going to have some evidence that some people would leave the market if it arises, not shift to another source, but leave the market. Now, forget about the other sources for a moment. Just take that narrow question. If that's the evidence, then that is, in fact, evidence of market power, is it not? Frankly, Your Honor, I think it's the opposite. I think that if we can't raise prices without the risk of driving Netflix away – not alternatives, necessarily, but not offering DVD by mail. And since the only way we make money is if they're in that market, then I think that's showing that we don't have money. If any product that is not an actual necessity, isn't it always the case that an increase by a market power supplier could drive customers from the market? You know, again, frankly, Your Honor, I'm just struggling with how to answer that question. We don't have enough economists testifying below. And that may be one that's beyond me. It sure seems to me that that would be an indication that we don't have market power, but frankly, I don't know what else to say to that. But I think, again, this goes to why it is so important to define the market properly. And that's the question the Commission decided. And that's the question we want remanded. Thank you very much, Your Honor. Can I ask a question of the Commission? There's one thing that's puzzled me. Can I ask a question of the Commission? Certainly, Your Honor. If Netflix said that you argued the contrary, you argued, if I understand correctly, that you understood that if the service raised the price somewhat of the mailer, Netflix would absorb it and that they would, therefore, capture some of the profit of Netflix. That was your argument, right? Yes, that is an argument. So, therefore, a contention or evidence that a raise in price would move Netflix out of the market would run against you. I think counsel's right. Isn't that correct? Because that would inhibit the Postal Service's ability to raise prices. If Netflix's testimony before the Commission was, any increase in the price of the mailer will drive us out of the market, that suggests a constraint on the Service's ability to monopolize. It may. I'm not sure the Commission had occasion to reach that because I'm aware of no evidence in the record whatsoever. I thought in your brief you specifically argued that the Commission's concern was that the Service would capture part of Netflix's profit, which implicitly suggested, of course, that Netflix would absorb it. Yes, and that's actually what the evidence in this case showed. But the evidence that Netflix put out that they raised the price will get out supports their argument that it's competitive. Is there such evidence? There is no such evidence, Your Honor. I'm aware of no such evidence. I think what Mr. Belt is referring to, I'm not sure what he's referring to. I think what he's referring to is a statement made perhaps by Netflix in the prior discrimination complaint proceeding or some offhand statement about what will happen. So I'm wrong. Netflix in this proceeding never stated, as counsel has argued, that if the Service raises the price, they would be moved out of the market. I'm aware of no— Netflix did file a statement in this proceeding, but I don't know what it said. What the statement said, Your Honor, and this is a J67, actually, like it's cited, and again a J304, is that it would absorb. Or I believe that's Gamefly, and then Netflix, and then Gamefly in turn, a J60, cited statements in Netflix's 10-K that said, no, we're going to absorb the price. Well, I'm correct, am I not? If Netflix had put in evidence that if the Service raised the price, it would leave the market, that would demonstrate the Service does not have market power. I don't think that that evidence, no— No, no, I'm just assuming hypothetically. Hypothetically, if that evidence was in— I think if your question is— You understand my question. I do. I think that— I'm assuming arguendo that evidence is in. Right. Okay, if that's correct. On no further facts, no, that's not sufficient. I would say that that's not sufficient, but it would tend to show that, yes, there would be some constraint on the postal service. Why wouldn't be powerful evidence? I don't understand. Well, I think you'd have to look at everything. Wouldn't that be evidence of monopoly power? You have monopoly, you drive someone out of business because of your monopoly power, and then you're sitting pretty, or not, because you don't have a business. No, no, I mean— Wait a minute, you don't have—you're not sitting pretty because— You killed the Golden Goose. You killed the Golden Goose. There's nothing there. Well, I guess maybe—are there other people in the market? I don't know. I mean, there could be other ways, I suppose, in which the postal service might— I suggest we're not going to resolve fundamental parts of the— I mean, I think it's really— I would just like to know whether this evidence is in the record or not. Perhaps I could ask counsel for— I'm not aware of anything. But just to address what I think he's talking about, I think he's talking about the discrimination—evidence in the discrimination complaint. Not in this case. Right, not in this case. That some statement by Netflix to this effect. And I think, at most, what that statement would say is that, yeah, there might be— Netflix, in some sense, there might be some level of competition. It doesn't certainly—it's not competent evidence to say that they would, like, leave the market. And that seems quite unlikely on these facts, given that Netflix is apparently still reaping substantial profits. Again, just keep in mind, too, it doesn't have to be that big of a price increase for there to be market power. The merger guidelines talk about a small but significant increase in price, which is typically five percent or more. We're talking about a product that costs a dollar a pop, like a five-cent increase or something. And it seems incredibly likely, given the evidence concerning Netflix's profit margins, that, yeah, there could well be that. But the important point is that we just don't have enough competent evidence to really intelligently answer that question one way or the other. And just with regard to the discrimination complaint, on that evidence, I mean, the Postal Service makes a lot of the discrimination complaint with regard to the monopsony power point. And I didn't understand that below. And I thought—this is at JA-130— that that's not the context in which they raised the monopsony point. They contended that Netflix and Gamefly both had monopsony power because they were big buyers. They weren't relying on the discrimination between Netflix and Gamefly. And, moreover, remember that the Postal Service was also discriminating against— was giving Blockbuster some manual processing. And Blockbuster certainly wasn't a monopsonist. So there's absolutely no evidence of monopsony here. Let me just ask one question. He's— Okay. I'm deferring to you. I think we should all— You haven't since answered my question. Thank you both for your indulgence. The case is submitted.
judges: Pillard, Silberman, Sentelle